# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK



ADAM CUNNINGHAM, ALEX CHEFALO and
REMO PAGLIA, et al.,
          Plaintiffs,

      v.

SUDS PIZZA, INC., MARK'S PIZZERIA,
INC. and MARK S. CRANE,
          Defendants.

15-CV-6462

---

### FINAL ORDER AND JUDGMENT APPROVING RULE 23 CLASS ACTION SETTLEMENT AND SETTLEMENT AGREEMENTS PURSUANT TO THE FLSA, AND AWARD OF ATTORNEYS' FEES, SERVICE AWARDS AND REIMBURSEMENT OF EXPENSES AND COSTS

#### Findings of Fact

#### Background of the Case

1.  On August 6, 2015, Adam Cunningham, Alex Chefalo, and Remo Paglia ("plaintiffs"), former employees of defendant Mark's Pizzeria (hereinafter "Mark's"), Suds Pizza and Mark S. Crane ("Crane") (collectively, "defendants") filed a complaint on behalf of themselves and others similarly situated alleging defendants violated the Fair Labor Standards Act ("FSLA") and the New York Labor Law ("NYLL"). See Complaint (Docket # 1). Specifically, plaintiffs alleged that defendants:

> a. Employed individuals to deliver pizzas who used their own vehicles and paid those individuals minimum wage, or slightly above, without reimbursement for vehicle-related expenses, resulting in the individuals making less than minimum wage, in violation of the [FSLA], and applicable state laws and regulations;

1

b. Charged customers a mandatory delivery charge for the delivery of food items, and retained said charge without remitting it to the delivery drivers as customers could reasonably expect, in violation of applicable laws and regulations;

c. Required employees to work shifts spanning in excess of ten hours without paying them for one additional hour at the basic minimum rate, in violation of applicable state laws and regulations;

d. Required employees to wear uniforms and failed to maintain said uniforms or pay employees an allowance for maintenance, in violation of applicable state laws and regulations; and

e. Failed to provide employees with proper written notices, including wage notices, required under New York State laws and regulations.

Decl. of Robert Mullin, Aug. 2, 2017 (Docket # 58-2), at ¶ 2.

2.    Defendants own and operate pizza restaurants in New York State.    Crane is the founder and owner of Mark's, a pizza franchisor; the remaining defendants are franchisees of Mark's. See Complaint (Docket # 1), at 7-9.    An important issue in the case was whether the franchisees and Mark's, the franchisor, could be considered joint employers for purposes of FLSA liability.

3.    Defendants answered on October 15, 2015, denying plaintiffs' claims and asserting various defenses.    See Answer (Docket # 15).    The Court held a scheduling conference and issued a scheduling order, and the parties engaged in discovery.    Pursuant to the scheduling order, the parties agreed on a mediator and began to explore settlement possibilities. Meanwhile, on March 25, 2016, plaintiffs    moved    to    conditionally    certify    the    class    and

2

preliminarily approve the settlement pursuant to 29 U.S.C. § 216(b).  See Mot. to Certify Class Conditionally (Docket # 28). That motion was unopposed.

4.    The parties mediated the case with William Bauer, Esq., on April 21, 2016, and reached a "rough agreement."  Docket # 58-2, at ¶ 13.    After the mediation, the parties continued to negotiate several key terms of the settlement in principle, and a final settlement agreement was executed on July 8, 2016 (the "Original Settlement Agreement").  Id. at ¶ 15.

The Original Settlement Agreement

5.    After reaching settlement, the parties consented to magistrate judge jurisdiction.  See Consent (Docket # 33).

6.    This Court preliminarily certified the class and preliminarily approved the Original Settlement Agreement on December 2, 2016.  See Order (Docket # 37).  The Court set a final hearing for March 17, 2017, before which the parties were to move for final settlement approval and attorneys' fees.    The Order provided that notices to class members were to be sent in accordance with the Original Settlement Agreement, i.e. within 30 days of the preliminary approval.

7.    On or about February 23, 2017, the defendants' attorneys notified the Court that notice had not been sent to approximately 235 current and former employees of Ovid Pizza, Inc. (the "Ovid Class Members"), a franchisee of Mark's Pizzeria.  Decl. of Kevin

3

J. Mulvehill, Feb. 24, 2017 (Docket # 43-1), at ¶ 8.  According to the parties, the Ovid Class Members were originally not sent settlement notices because the majority shareholder of their employer, Ovid Pizza, Inc., refused to consent to become a defendant.  After a telephonic conference, the defendants filed a motion to approve amended notice packets to send to the Ovid Class Members.  See Docket # 43.

8.    On March 7, 2017, the plaintiffs filed their first motion for final settlement approval (see Docket # 46) and their first motion for attorneys' fees (see Docket # 47).

9.    On March 17, 2017, the Court held a hearing on the motion to approve amended notices (see Docket # 43), the motion for final settlement approval (see Docket # 46) and the motion for attorneys' fees (see Docket # 47).

10.   As the Court reminded counsel at the hearing, this Court acts as a fiduciary to the proposed class in evaluating the settlement.  Therefore, it was incumbent on counsel to make sure that the Court was provided with sufficient information to find that the settlement was both substantively and procedurally fair and in the best interests of the class.  See City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974).

11.   At the hearing, the Court heard from the parties' attorneys and one class member.  The class member did not object

4

to the settlement, but noted that he wished he would receive more money under the Original Settlement Agreement.

12.   Under the Original Settlement Agreement, defendants agreed to fund the settlement with $1.7 million (the "Settlement Amount"). Original Settlement Agreement (Docket # 58-2, Ex. A, at 18). The Settlement Amount includes any amount the Court approves for attorneys' fees, costs, service awards and enhancement payments (collectively, "Administrative Costs"). Id.

13.   The Original Settlement Agreement sought the payment of up to one-third of the Settlement Amount (equivalent to $566,667), costs, and service awards and enhancement payments to named plaintiffs and class members who submitted sworn declarations. The Court questioned counsel on the reasonableness of attorneys' fees set forth in the Original Settlement Agreement. The Court's concern as to the legal fees sought centered on the relationship between the Net Settlement Amount and the attorney fees sought. The Court also expressed concern over the impact of the "reversion clause" in the Original Settlement Agreement.

14.   The Net Settlement Amount is the Settlement Amount less the Administrative Costs. Each Settlement Class Member who submits a valid and timely claim form (a "Qualified Claimant") is assigned a proportional share of the Net Settlement Amount. The value of each Qualified Claimant's award is

based upon the weeks worked in a position covered by
this settlement from August 6, 2009 through preliminary
approval.  A Qualified Claimant's workweek count shall
be   calculated   by   dividing   the   days   between   the
employee's first and last dates during the class period
by seven and rounding to the nearest integer; *provided,*
*however,* any workweeks of a Qualified Claimant within
Subclass B shall be further divided by two.   Each
Qualified Claimant will be entitled to his or her
individual   workweek   count,   divided   by   the   total
workweeks for all Class Members [i.e. including those
that opt out and do not submit claim forms], times the
amount of the Net Settlement Amount.

Original Settlement Agreement (Docket # 58-2), at 20.   In other

words, under the Original Settlement Agreement, each class member

is assigned a proportion of the Net Settlement Amount based on his

or her average hours in a workweek divided by the total number of

workweeks for all class members.   See Docket # 58-2, at 19-20.   By

dividing the workweek of an individual Qualified Claimant by the

workweeks of all class members, this formula in effect assigns a

proportion of the Net Settlement to all class members even though

only those who submit claim forms will receive their respective

share.

15.   The Original Settlement Agreement included a reverter

clause, in which unclaimed settlement funds would revert back to

defendants.   That clause read in part:

Upon the expiration of 100 days after the distribution
of the settlement checks, the amounts representing the
Net Settlement Amount that have not been claimed, cashed
or were unable to be delivered despite the Settlement
Administrator's good faith efforts, will be distributed
to and retained by the Mark's Pizzeria Franchises.   In
addition,   upon   the   expiration   of   30   days   after   the

6

> distribution of the settlement checks, the proportional
> share of the Net Settlement Amount attributed to all
> Class Members who opt out of the settlement will be
> distributed to and retained by the Mark's Pizzeria
> Franchises.

Docket # 58-2, at 23.   Under this provision, if a class member

submits a claim form, his or her share of the Net Settlement Amount

is paid out.   However, if a class member does not submit a claim

form, his or her share of the Net Settlement Amount would revert

back to defendants.   See id., at 19-20.

16.   It was only after questioning counsel that the Court

came to appreciate the true monetary "value" of the settlement and

the impact of the reversion clause.   While application of the

reversion clause would operate to substantially reduce the cost of

the settlement to the defendants, it would have absolutely no

effect on the calculation of attorney fees paid to plaintiffs'

counsel. Under section 13(a) of the Original Settlement Agreement,

plaintiffs' attorneys would receive one-third of the full

Settlement Amount, irrespective of what part of that amount was

actually paid out in claims.   Id. at 19.   Moreover, as all counsel

readily conceded, it was never anticipated by the parties that a

large percentage of potential class members would ever take time

or make the effort to file claim forms.   Indeed, the "yield rate"

- the percentage of potential class members who actually decided

to participate in the settlement - was expected to be a relatively

small fraction of those who were eligible to benefit from the settlement.

17. Plaintiffs' counsel and their paralegal spent 367.55 hours[1] on this case, at a proposed hourly rate of $325. Computing attorney fees at the proposed hourly rate resulted in attorney fees of $115,743.75. See Mullin Decl., Docket # 47-2, at ¶ 47-48. Nevertheless, in their original fee application, plaintiffs' counsel requested compensation almost five hundred percent more than their fee would be if the court multiplied the hours worked on the case by the hourly rate proposed by counsel. Given the fact that the case settled after one mediation session and less than a year after being filed, the Court questioned all counsel on the reasonableness of the attorney fees being sought. The Court reminded counsel that as a fiduciary to the proposed class, it was under an obligation to evaluate the reasonableness of the settlement, including attorney fees, and would not simply "rubber stamp" the proposed settlement.

18. In their initial moving papers (see Docket ## 46, 47), plaintiffs acknowledged that when using a percentage of the fund method to calculate fees, courts use the "lodestar method" as a cross check on the reasonableness of the percentage sought as fees. In justifying their attorney fee based on a settlement value of

---

[1] Defense counsel incurred 15.92 hours of paralegal time, at the rate of $75 per hour.

8

$1.7 million, plaintiffs also claimed that a multiplier of almost five times their lodestar fee was justified.

19.   Based on both the concerns the Court expressed at the hearing over the reasonableness of attorney fees and the need to serve amended notices to the Ovid Class members, the Court scheduled a supplemental settlement approval hearing for June 13, 2017.   The Court granted the motion to approve the amended notices to the Ovid Class Members (see Docket # 51) and ordered that the notices allow any Ovid Class Member to object at the June 13, 2017 hearing.   The Court also directed the parties to file additional briefing to address the issues the Court raised regarding the attorney fee application, the "yield rate" of the settlement and the impact of the reversion clause.

20.   Plaintiffs filed an additional memorandum of law in support of their motion for attorneys' fees on June 5, 2017 (see Docket # 52), and defendants filed a declaration and memorandum of law in support of final settlement approval on June 8, 2017 (see Docket # 53).

21.   Plaintiffs filed another declaration on June 21, 2017. In that affidavit, the plaintiffs stated that 8,523 notices had been mailed to potential class members and 1,819 timely claims had been received.   Plaintiffs' submission confirmed that almost eighty percent of eligible class members were not participating in the settlement.   Based on the number of claims received and the

parties' preliminary calculations, the average payment would be $186 per Qualified Claimant; 26 claims would exceed $1000; 173 claims would exceed $500 and 903 claims would exceed $100.  See Docket # 55, at ¶ 2.

22.  The Court held the supplemental hearing on June 22, 2017. The Court expressed its continuing concern that counsel were consistently touting the value of the settlement as $1.7 million when all parties were aware at the time the settlement was being negotiated that only a small percentage of the eligible class members were likely to send in claim forms.  True to their belief, the yield rate of "opt-ins" confirmed that almost four out of five eligible plaintiffs were not benefitting from the settlement.  And, because of the reversion clause, the vast majority of the unclaimed "settlement fund" would never benefit the plaintiffs but would simply be paid right back to the defendants, all the while binding the entire class to the final judgment.  Based on the "yield rate," the actual value of the settlement in terms of the amount of money from the settlement fund paid to the plaintiffs was only $339,000. Indeed, the only calculation in which the $1.7 million "settlement value" was actually utilized in the Original Settlement Agreement was the calculation of plaintiffs' attorney fees.

10

23.   Had   the   Court   approved   the   Original   Settlement
Agreement, $339,000 would have been paid to plaintiffs,[2] $566,667
would have been paid to plaintiffs' counsel, and the rest would
have simply been paid right back to the defendants.   In terms of
cost to the defendants, the true value of the settlement was less
than a million dollars - and most of that was not being paid to
class members who were allegedly harmed, but to the lawyers who
represented them.   Moreover, in return for a judgment binding the
entire class and a reversionary clause that returns to them almost
half of the $1.7 million paid by the defendants to "fund" the
settlement,   defendants   agreed   not   to   oppose   the   plaintiffs'
attorney fee application.   See Docket # 59, at 2.   Based on the
foregoing, the Court advised the parties that it was not likely to
approve the Original Settlement Agreement.

24.   While this Decision and Order pays tribute to the fact
that the parties considered the Court's concerns and revised the
attorney fee provisions in the settlement agreement for the benefit
of the class, the Court nevertheless believes it important to
formally preserve its concerns on the ethical dangers lurking in
many of the so-called "opt-in" class action settlements.

---

[2] The Court arrived at this rough number by multiplying the number of timely
claims received (1,819) by the average claim amount ($186), as provided in
plaintiffs' supplemental memorandum of law in support of their first motion for
attorneys' fees.   See Docket # 52.

25.  Although lauded to the Court as such, this settlement was not, and was never contemplated to be a $1.7 million settlement.  Counsel here, having negotiated such settlements before, knew that a significant percentage of eligible class members would not file claims.  Indeed, "[n]umerous studies and articles show that potential class and collective members rarely participate in class action settlements when such settlements require opt-in."  McGreevy v. Life Alert Emergency Response, Inc., No. 14 civ. 7457, 2017 WL 1534452, at n.1 (S.D.N.Y. Apr. 28, 2017).

26.  Here, almost 80% of the potential class members did not file claims to share in the settlement, a participation rate both parties actually expected.  Despite this anticipated lack of participation, counsel negotiated the settlement in such a way that unclaimed settlement funds revert back to the defendants. Thus, it is beyond dispute that almost 80% of the "settlement fund" was never at risk of being paid out by the defendants as part of the original settlement proposal.  Hence, extoling the value of the originally proposed settlement as $1.7 million is both flawed and misleading.  This sum represents an "inflated and illusory" value not grounded in the practical realities of opt-in class action settlements, the true value of which is dependent on how many class members file claims.  McGreevy, 2017 WL 1534452, at *5.

27.  The incentive of all counsel to structure a settlement like the original proposal presented to the Court is obvious.

12

Class counsel may agree to a reversionary structure, even though much of the settlement fund will never be paid, as the settlement amount will look more substantial in the notice to class members, and class counsel may hope to recover a fee award based on a percentage of the gross settlement amount. Defendants may acquiesce to a higher gross settlement amount, knowing they will pay only a fraction.

Id. at *6; see In re TJX Cos. Retail Sec. Breach Litig., 584 F. Supp. 2d 395, 405 (D. Mass. 2008) ("Thus, class counsel can—and likely often do—push defendants for higher payout caps or fund amounts in order to expand the basis for their fee petition without any real expectation that those additional funds will be claimed by the class.").

28. Equally troublesome is the combination of a reversion clause and a "clear sailing" clause in the same settlement agreement. Under a "clear sailing" clause, the defendants agree not to object or contest to plaintiffs' counsel's attorney fee application. "Such a clause by its nature deprives the court of the advantages of the adversary process." Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518, 525 (1st Cir. 1991). "It is unlikely that a defendant will gratuitously accede to the plaintiffs' request for a 'clear sailing' clause without obtaining something in return." Malchman v. Davis, 761 F.2d 893, 908 (2d Cir. 1985) (Newman, J. concurring), abrogated on other grounds by Amchem Prod., Inc. v. Windsor, 521 U.S. 591 (1997). That "something in return" might logically be a reversionary clause,

13

particularly in a case where, as here, the parties expect that only a small fraction of the settlement fund will ever be claimed by class members. See also Teoba v. TruGreen Landcare, L.L.C., No. 10-CV-6132, 2015 WL 13424068, at *2 (W.D.N.Y. July 29, 2015) (expressing concerns about justifying an attorney fee request in an opt-in FLSA class action based upon a percentage of an artificially inflated settlement fund).

29.   The dangers of cultivating a conflict of interest between the plaintiff class and class counsel are clearly more pronounced in these situations and "suggest, strongly, that the fee request be placed under the microscope of judicial scrutiny." Weinberger, 925 F.2d at 525; see In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 948 (9th Cir. 2011) ("[W]hen confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested."); Stokes v. Saga Int'l Holidays, Ltd., 376 F. Supp. 2d 86, 90 (D. Mass. 2005) ("Clear sailing clauses can breed circumstances ripe for conflicts of interest between the members of the plaintiff class and counsel for the plaintiffs.").

30.   Counsel's argument that Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423 (2d Cir. 2007) supports approval of the

14

fee application here is not persuasive. It is true that in Masters
the Second Circuit held that a district court erred in
"calculat[ing] the percentage of the Fund on the basis of the
claims made against the Fund, rather than on the entire Fund
created by the efforts of counsel." Id. at 436-37. But, as the
Court pointed out to counsel, there is a critical difference
between the settlement agreement in Masters and the agreement here.
In Masters, the settlement created a sum certain fund, the entirety
of which was going to be distributed under the terms of the
settlement. While the settlement agreement in Masters required
class members to file claims to benefit from the settlement, any
funds left over were not returned to the defendants, but were
distributed to charities that were intended to benefit the
plaintiffs.[3] Id. at 432. Thus, once the court approved the
settlement, the entire settlement fund was certain to be
distributed and no "unclaimed" funds were going to be paid back to
the defendants. Where an entire settlement fund is going to be
paid out for the benefit of the class, the Second Circuit held
that it was appropriate to evaluate a fee application based on a
percentage of the total fund created, even though only those class
members who chose to file claim forms would receive settlement
funds. The court reasoned that the entire fund was created by the

---

[3] The settlement agreement in Masters conferred discretion upon the Court to
dispose of unclaimed funds.

efforts of counsel and "was paid to the class, even if some of the funds are distributed [to charities] under the Cy Pres Doctrine." Id. at 438 (internal quotation marks omitted).

31. There is no Cy Pres provision in the settlement agreement before the Court - only a reversion clause and a clear sailing provision. The $1.7 million settlement fund is imaginary because all counsel have candidly acknowledged that they anticipated much of the money allocated to the settlement would revert back to the defendants based on the anticipated response rate to the claim filing requirement. Counsels' arguments notwithstanding, the Second Circuit's decision in Masters does not require approval of the fee application here. See Bodon v. Domino's Pizza, LLC, No. 09-CV-2941 SLT, 2015 WL 3889577, at *4 (E.D.N.Y. June 4, 2015), report and recommendation adopted sub nom. Bodon v. Domino's Pizza, Inc., No. 09-CV-2941 SLT RLM, 2015 WL 3902405 (E.D.N.Y. June 24, 2015) (Masters does not "mean that plaintiffs' counsel are entitled to a percentage of a hypothetical recovery."); Faican v. Rapid Park Holding Corp., No. 10-cv-1118, 2010 WL 2679903, at *3 (E.D.N.Y. July 1, 2010) ("holding that Masters offers no support" for an attorney fee award based on what defendant "would have paid to eligible class members who rejected the settlement if they had accepted the settlement").

32. Based on the foregoing, the $566,667 attorney fee sought in the Original Settlement Agreement was unreasonable under any

16

measure.   That fee was based on an illusory claim that the value of the negotiated settlement was $1.7 million.  Based on the claims filed, the true value of the settlement was approximately $339,000. Using the hourly rates I recently adopted in another "claims made" class action settlement involving plaintiffs' counsel, see Taylor v. Delta-Sonic Car Wash Systems, Inc., No. 14-cv-6698, 2017 WL 436045 (W.D.N.Y. Jan. 31, 2017), a presumptively reasonable attorney fee award based on the actual settlement would be about $106,000, which represents 31% of the actual settlement.   Such a percentage is consistent with attorney fees awarded in class action litigation in the Second Circuit.  Id. at *7-8, n.2 (citing cases). If I were to award the fees originally sought by plaintiffs' counsel, the fee award would represent 160% of the settlement funds actually paid to class members.  Such a windfall in attorney fees strikes this Court as unreasonable and improper.   See Pearson v. NBTY, Inc., 772 F.3d 778, 781 (7th Cir. 2014) (district court abused its discretion in approving "claims made" settlement of class action where attorney fees represented 69% of the actual money paid by defendants to class members).

33.   In   addition,   the   Original   Settlement   Agreement's reversionary clause ensured that any reduction in attorneys' fees would   disproportionately   benefit   defendants   rather   than plaintiffs.    To  be  sure,  reducing  the  attorneys'  fees  would increase  the  "pot"  of  settlement  funds  from  which  claimants'

payments would be made.   But because only 21% of class members filed claims, those class members would only reap 21% of the benefit of any reduction in attorneys' fees; the rest would revert to defendants.   For example, if the Court were to reduce the attorneys' fee award from $566,667 to $300,000, only 21% of the $266,667 difference would be paid to the Qualified Claimants.

34.   In light of these concerns regarding the attorney fee application, the Court notified all counsel that it was not inclined to approve the Original Settlement Agreement and encouraged the parties to consider revising the formula used to calculate attorney fees in order to bring the amount sought within a range of reasonableness.   Counsel asked for the Court's informal assistance in revising their application. I informed counsel that I would be willing to do so only with the specific understanding that any views expressed would be preliminary and nothing in my "guidance" should be construed as limiting or binding on the Court in any decision or opinion I may make in determining whether to approve the proposed attorney fees in this case.   All counsel agreed.

## The Modified Settlement Agreement

35.   On August 2, 2017, the plaintiffs filed their second motion for final approval of the settlement (Docket # 58) and their

18

second motion for attorneys' fees (Docket # 59).[4] The Modified Settlement Agreement (described below) and attorney fee application reflect consideration of the Court's concerns over the fairness of certain provisions in the Original Settlement Agreement and fee application. Counsel have represented to the Court and the Court agrees that the proposed modifications are entirely more favorable to the class in that they result in a larger distribution of settlement funds to class members which in turn results in a lower reversion of settlement funds to the defendants and less attorney fees to the plaintiffs' lawyers. Specifically, the Modified Settlement Agreement would nearly double the average claim amount; the average claim under the Modified Settlement Agreement is $323, an additional $137 per claim or a 74% increase over the average claim under the Original Settlement Agreement. Additionally, the Modified Settlement Agreement would result in 133 claims exceeding $1,000; 383 claims exceeding $500 and 1,181 claims exceeding $100. Docket # 61, at 2.

36. Plaintiffs' second set of motions request that the Court approve the Original Settlement Agreement with an annexed modification. These documents will be referred to collectively as the "Modified Settlement Agreement." The modification replaces

---

[4] These motions supersede plaintiffs' original motions for final approval of the settlement agreement (Docket # 46) and motion for attorneys' fees (Docket # 47). Accordingly, the earlier motions are now denied as moot.

19

Section 13(a) of the Original Settlement Agreement with a provision that allows for attorneys' fees of not less than $318,000, and a requirement that the resulting reduction in these attorneys' fees be distributed to the class members who have made claims rather than paid back to the defendants pursuant to the reversion clause. Counsel and all named parties signed the modification. See Docket # 58-2, at 42-57.

37.   The Modified Settlement Agreement defines Class Members as "Adam Cunningham, Alex Chefalo, and Remo Paglia and all other current or former employees of Defendants and Mark's Pizzeria Franchises who worked on an hourly basis anytime during the period August 6, 2009 through preliminary approval of the settlement by the Court." Id. at 2.  The Modified Settlement Agreement proposes to divide Settlement Class Members[5] into "Subclass A" and "Subclass B." Subclass A is defined as Settlement Class Members who worked as delivery drivers. Subclass B is defined as all other Settlement Class Members who were not delivery drivers. Id. at 17.

38.   The Modified Settlement Agreement leaves unchanged the $1.7 million Settlement Amount, from which Administrative Costs are subtracted to reach the Net Settlement Amount.

39.   The Modified Settlement Agreement also left unchanged the formula for calculating each Qualified Claimant's portion of

---

[5] All class members who do not opt out.

20

the Net Settlement Amount.   Each award hinges on the number of

weeks the employee worked for defendants.    The value of each

Qualified Claimant's award is

> based upon the weeks worked in a position covered by
> this settlement from August 6, 2009 through preliminary
> approval.  A Qualified Claimant's workweek count shall
> be  calculated  by  dividing  the  days  between  the
> employee's first and last dates during the class period
> by seven and rounding to the nearest integer; *provided,*
> *however,* any workweeks of a Qualified Claimant within
> Subclass B shall be further divided by two.    Each
> Qualified Claimant will be entitled to his or her
> individual  workweek  count,  divided  by  the  total
> workweeks for all Class Members [i.e. including those
> that opt out and do not submit claim forms], times the
> amount of the Net Settlement Amount.

Id. at 20.   Again, by dividing the workweek of an individual

Qualified Claimant by the workweeks of all Class Members, this

formula in effect assigns a proportion of the Net Settlement to

all Class Members, but only those who submit claim forms will

receive their respective share.

40.  As  noted  above,  the  Modified  Settlement  Agreement

changed the Original Settlement Agreement to allow the Court to

set attorneys' fees at a sum "not less than $318,000.00 to

compensate and reimburse Class Counsel for their attorney's fees

plus up to $5,000.00 to reimburse them for their actual litigation

costs."   Docket # 58-2, at 43.

41.   The  Modified  Settlement  Agreement  also  amended  the

Original  Settlement  Agreement  so  that  the  difference  in  the

attorney fee awards would bypass the reverter clause, thereby

21

allowing plaintiffs, rather than defendants, to reap the full benefit of the reduced attorney fee award.  That provision reads:

> The total amount paid to all Qualified Claimants shall be increased by $566,666.00 less the amount actually awarded to Class Counsel by the Court for attorney's fees, provided said award is not less than $318,000 (the ["]Additional Payment").  The Additional Payment shall be distributed to Qualified Claimants on a pro rata basis.
>
> By way of example, if Qualified Claimant A's share is initially calculated to be $1,000.00, and the total of all Qualified Claimants' initial shares is $100,000.00, then Qualified Claimant's pro rata basis is 1%.  He or she will also therefore receive 1% of the Additional Payment, in addition to his or her initial share.

Id.

42.   The reverter clause itself, however, remained unchanged in the Modified Settlement Agreement.   Section 20 still reads, "the amounts representing the Net Settlement Amount that have not been claimed, cashed or were unable to be delivered despite the Settlement Administrator's good faith efforts, will be distributed to and retained by the Mark's Pizzeria Franchises."   Id. at 9. "In addition, upon the expiration of 30 days after the distribution of the settlement checks, the proportional share of the Net Settlement Amount attributed to all Class Members who opt out of the settlement will be distributed to and retained by the Mark's Pizzeria Franchises."   Id. at 9.   In other words, any portion of the Net Settlement Fund attributed to Class Members who did not submit claim forms or opted out revert to defendants.

22

43.   Turning to the substantive merits of the Modified Settlement Agreement, plaintiffs contend that there are several questions of law common to all class members: (1) "Whether not reimbursing delivery drivers for vehicle costs constitutes paying less than minimum wage;" (2) "Whether delivery charges assessed to customers must be considered gratuities pursuant to the New York Labor Law" and (3) "Whether the attire worn by Defendants' employees can be considered a uniform for purposes of the New York Labor Law."   Docket # 58-2, at 9.

44.   Notice of the proposed settlement was sent to over 8,500 Class Members. Id. at 10. Of those, 1,883 were initially returned as undeliverable, and 1,477 were mailed to new addresses.   Id. Ultimately, only 406 notices were undeliverable.   Docket # 59-2, at ¶ 45.   Only 120 Class Members opted out and 1,819 claim forms have been received.   Id.   No objections have been received.   Id.

45.   Adam Cunningham, Alex Chefalo and Remo Paglia, all named plaintiffs, requested service payments of $10,000, $7,500 and $7,5000, respectively.   According to class counsel, each of these named plaintiffs met extensively with counsel, and Adam Cunningham initially approached counsel about bringing the lawsuit.   Docket # 58-2, at 10.   These payments will be deducted from the Settlement Amount prior to calculating each Qualified Claimant's share.

46.   Brian Beyer, Antonio Caso, Joshua Kaplan, Erin Manning, Patrick Rich and Heather Valder, each of whom provided declarations

in support of class certification, also requested service payments of $500 each. Id. at 11. These payments will be deducted from the Settlement Amount prior to calculating each Qualified Claimant's share.

47.   The Modified Settlement Agreement also allows payment from the Settlement Amount for Claims Administration in this case, KCC Class Action Services, for the cost of the settlement administration.   Counsel estimated that this cost would be about $49,000. Id. at 13.

48.   Under the terms of the Modified Settlement Agreement, all Settlement Class Members who do not opt out will release defendants from claims related to proper pay or the receipt of required notices, from August 6, 2009 through December 2, 2016. Id. at 12.

49.   The defendants do not oppose the plaintiffs' motion for certification or final approval of the settlement, and do not contest counsel's attorneys' fee request.

## Conclusions of Law

### A. Motion for Final Certification:

1.   The Court finds that certification of the proposed class pursuant to Rule 23 of the Federal Rules of Civil Procedure is appropriate as the proposed settlement meets the requirements of Rule 23.   The numerosity requirement is met because the proposed

24

settlement class consists of 8,523 individuals.   See Second Mot. for Attorney Fees (Docket # 59-2), at ¶ 45.   The commonality and typicality requirements are met because there are obvious questions of law and fact common to and typical of all class members: whether failure to reimburse delivery drivers for vehicle costs results in paying them less than minimum wage; whether delivery charges are considered gratuities and whether the attire worn by class members constitutes a uniform.   All class members have suffered the same type of injury and in that sense are unified in common factual allegations against the defendants.   I find that the putative class members have been fairly and adequately represented by class counsel, both of whom have the expertise and experience to represent the class members in this action.   Finally, I conclude that a class action is the superior method of adjudicating this controversy because the named plaintiffs and class members lack the means to prosecute individual actions, individual lawsuits would not be economically worthwhile, no individual litigation is pending in other forums and there is no evidence that class members would have a strong interest in controlling the suit themselves.   In sum, a class action is the most economic and efficient mechanism to fairly and resolve the class claims against defendants.   Therefore, plaintiffs' motion for final certification of the settlement class pursuant to Rule 23 is hereby approved. For substantially the same reasons, the

25

Court also grants the plaintiffs' request to certify an FLSA collective action for purposes of settlement.

2.  The Court next turns to the fairness of the proposed settlement. "A court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to settlement." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005).

3.  In the Second Circuit, courts often evaluate a settlement's substantive fairness according to the so-called "Grinnell factors." See City of Detroit v. Grinnell Corp., 495 F.2d 448, 454 (2d Cir. 1974). The factors are: (1) "the complexity, expense and likely duration of the litigation;" (2) "the reaction of the class to the settlement;" (3) "the stage of the proceedings and the amount of discovery completed;" (4) "the risks of establishing liability;" (5) "the risks of establishing damages;" (6) "the risks of maintaining the class action through the trial;" (7) "the ability of the defendants to withstand a greater judgment;" (8) "the range of reasonableness of the settlement fund in light of the best possible recovery" and (9) "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." Id. at 463.

4.  Having considered the relevant Grinnell factors, the Court finds they support final approval of the proposed settlement.

FLSA and class action cases can be complex and expensive to litigate, often requiring protracted periods of litigation. No objection to the proposed settlement has been received by the class administrator or the Court. Based on the representations of plaintiffs' counsel, I find that although this case settled at a fairly early stage, sufficient factual investigation of the case has been conducted and the parties have adequate information to properly evaluate and understand the strength and weaknesses of their positions and the risks faced with continued litigation. The Court also concludes that the risks plaintiffs face in proving liability and establishing damages in this case are real and favor final approval of the Modified Settlement Agreement. I find the defendants' ability to withstand a greater judgment is not a relevant factor in evaluating this particular settlement. Finally, based on my review of the entire record, including multiple declarations submitted by Robert Mullin, Esq. in support of the settlement, the Court finds that settlement is within an acceptable range of reasonableness given the risks of continued litigation.

5. As to procedural fairness, the Court concludes that plaintiffs were represented by competent counsel with experience in wage and hour litigation. The Settlement Agreement appears to be the result of arms-length negotiations culminating in an agreement reached with the assistance of an experienced and

respected mediator.    There is no evidence of fraud or collusion infecting the settlement process or the agreement reached.

6.    Therefore, considering the totality of the circumstances set forth in the record before this Court, I conclude that the agreement is both procedurally and substantively fair and reasonable.

B. Motion for Attorney Fees, Service Payments and Costs:

7.    Plaintiffs' counsel has filed a renewed application for attorney fees for "a sum to be determined by the Court, but not less than $318,000." Docket # 58-2, at 43.    As the fiduciary for the rights of the absent class members, I previously expressed concerns over the amount of attorney fees sought by plaintiffs' counsel in their first motion for attorneys' fees (Docket # 47). My review of the docket sheet suggests that although the case involved a relatively large class, the litigation was fairly straightforward, involved a relatively discrete, although unsettled, legal issue and generated limited motion practice.    The complaint was filed August 6, 2015, and the matter was settled less than a year later after a one-day mediation session.    The parties exchanged discovery but took no depositions.

8.    Given my fiduciary responsibilities towards the absent class, counsel should not be surprised by the Court's scrutiny of any attorney fee application.    In seeking approval, plaintiffs' motion papers emphasize that their fee application is unopposed by

either the defendants or any class members. As discussed earlier, the lack of opposition is really of little moment to the Court, except that it requires the Court to exercise increased scrutiny. "Often, fee applications are unopposed. Defendants have little concern for what portion of the settlement goes to plaintiffs' counsel. And unlike a securities class action, where the class likely contains sophisticated investors, most FLSA class members are not in a position to object." Lizondro-Garcia v. Kefi LLC, No. 12-civ-1906, 2015 WL 4006896, at *4 (S.D.N.Y. Jul. 1, 2015) (quoting Fujiwara v. Sushi Yasuda Ltd., 58 F. Supp. 3d 424, 436 (S.D.N.Y. 2014) ("Those best suited to dispute the fees—the class representatives—would be forced to oppose their own lawyers and in any event are often placated with outsized service awards. The risks presented by class action settlement—and the need for judicial scrutiny—have long been recognized.")). Ultimately, "[w]hat constitutes a reasonable fee is properly committed to the sound discretion of the district court." Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000).

9.    Plaintiffs' lawyers initially asked the Court to award $566,667, or one-third of the Settlement Amount as attorney fees. For the reasons articulated above, the Court rejected that proposal and plaintiffs withdrew the request by virtue of their filing of a second motion for attorneys' fees.

10. Plaintiffs' lawyers now ask the Court to award a sum of not less than $318,000. This sum represents a reduction of almost $250,000 or 44% from their original fee application. It is the Court's responsibility to determine whether such a fee is fair and reasonable. For the reasons set forth below, and given all the circumstances, this fee, although on the upper edge of a range of reasonableness, will be approved.

11. As I stated earlier, the fund created for the benefit of the class was never truly $1.7 million. However, based on the modifications made to the Original Settlement Agreement, the actual value of the settlement to the plaintiffs has now been increased from approximately $339,000 to $587,000 - an increase of 58%, which is substantial by any measure. See Decl. of Robert Mullin (Docket # 61). The $318,000 attorney fee sought by plaintiffs' counsel still represents 54% of the actual value of the settlement, a percentage higher than the Court would ordinarily consider reasonable. However, there are factors that, under the facts presented here, bring this proposed fee into a range of reasonableness.

12. First, plaintiffs' counsel agreed to take this case on a contingency fee basis, an arrangement that has been held to constitute a risk not inherent in other types of billing arrangements for legal services. "The fact that counsel here worked

on contingency clearly entitles them to some premium for the risk incurred." Fujiwara, 58 F. Supp. 3d at 438-39.

13. Second, aside from the risk inherent in taking a case on a contingency basis, there was some additional litigation risk in prosecuting this particular FLSA case. Each of the defendant pizzerias here was a franchisee. The liability of a franchisor as an employer is an open question dependent on whether the franchisor can be viewed as a joint employer under the FLSA. See Cordova v. SCCF, Inc., No. 13CIV5665-LTS-HP, 2014 WL 3512838, at *4 (S.D.N.Y. July 16, 2014) ("The Second Circuit has not yet considered whether a franchisor can qualify as a joint employer, but the Moving Defendants cite decisions from other circuits, in which courts, using versions of the economic reality test established by the Supreme Court, have generally concluded that franchisors are not employers within the meaning of the FLSA."). But see Ocampo v. 455 Hospitality LLC, No. 14-cv-9614, 2016 WL 4926204 (S.D.N.Y. Sept. 15, 2016) (finding "that these allegations, taken together, state a plausible claim that Franchisor Defendants were Plaintiffs' joint employers under the FLSA and NYLL"); Olvera v. Bareburger Grp. LLC, 73 F. Supp. 3d 201, 207 (S.D.N.Y. 2014) (finding, given the facts there, that plaintiffs had "pled enough facts" to establish for purposes of surviving a motion to dismiss that "franchisor defendants were joint employers under the FLSA"). If it was determined that the franchisor here was not legally

31

responsible for the actions of mere franchisees, the opportunity for any recovery to benefit the class would be substantially diminished.  Thus, the ability to settle this action despite the uncertainty over this dispositive legal issue was particularly beneficial to the plaintiffs.

14.  Third, this Court acknowledges that some courts have held that the Second Circuit's decision in Masters, supra, allows attorneys' fees to be computed as a percentage of an entire common fund rather than just the portion paid to class members, even when unclaimed funds revert to defendants and not to charities intended to benefit the class.  See, e.g., In re Nigeria Charter Flights Litig., No. 04-cv-473, 2011 WL 7945548, at *5 (E.D.N.Y. Jan. 28, 2010) (Masters requires attorneys' fees as a percentage of a common fund be measured against the entire fund rather than just the portion paid to class members, even when unclaimed funds revert to defendants).  While this Court obviously disagrees with that interpretation of Masters, it must also recognize the willingness of the parties here to voluntarily enhance the monetary recovery to the plaintiffs.  To be sure, by reducing the fee application and not applying the reversion clause to the agreed upon fee reduction, the parties have agreed to a modification that operates as a significant benefit to the plaintiffs who made claims.  For example, the average claim under the Original Settlement Agreement

was $186, while the average claim paid under the Modified Settlement Agreement is $323. See Docket # 61, at 2.

15. Finally, the Court has utilized the lodestar calculation to cross-check the reasonableness of the percentage of the fund fee request by plaintiffs' counsel. The first step in using the lodestar calculation to cross-check plaintiffs' percentage of the fund fee request is to multiply the number of hours counsel reasonably expended in litigating the case to settlement by a reasonable hourly rate that lawyers in this district would charge in a similar case. This calculation produces a presumptively reasonable fee. See Millea v. Metro-North R. Co., 658 F.3d 154, 166 (2d Cir. 2011) ("Both this Court and the Supreme Court have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a presumptively reasonable fee.") (internal quotation marks and citation omitted).

16. Once the presumptively reasonable fee is calculated, the Court may enhance the fee when the fee does not "adequately take into account a factor that may properly be considered in determining a reasonable fee." Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 553 (2010). "[T]he burden of proving that an enhancement is necessary must be borne by the fee applicant." Id. at 552.

17. Plaintiffs' counsel seek an across the board rate of $325 per hour for attorney time and $75 per hour for paralegal time. Robert Mullin, Esq. has submitted time records claiming 395.71 hours of out of court time and 13 hours of in-court time for a total of 408.71 hours. This number also includes 15.92 hours of paralegal time billed at $75 per hour. Justin Cordello, Esq. has submitted time records claiming 50.83 hours of out of court time and no in-court time for a total of 50.83 hours. Thus, the total is 443.61 hours at a $325 hourly rate for attorney time, and 15.92 hours at a $75 hourly rate for paralegal time, resulting in 459.53 hours[6] or an award of $145,367.25.

18. Counsel for plaintiff requests an enhancement of $172,632.75, approximately 119% of the hours-based fee, based on "excellent result as well as the substantial risks incurred by taking this case on a contingency basis." See Pls.' Mem. of Law in Support of Unopposed Mot. for Attorney Fees and Costs (Docket # 59-1) at 24. Application of a 2.19 multiplier to the hourly rate calculation of $145,367.25 results in the requested fee of $318,000.

19. Of course, central to counsel's lodestar calculation is the $325 per hour rate they have chosen to apply to their legal services. "The reasonable hourly rate is, generally, the hourly

---

[6] Based on the Court's calculation, the total number of hours would be 459.54 and the total number of attorney hours would be 443.62. We use plaintiffs' figure for clarity.

rate employed by attorneys in the district in which the litigation is brought." Mendez v. Radec Corp., 907 F. Supp. 2d 353, 357 (W.D.N.Y. 2012).

20. In a recent FLSA case involving plaintiffs' counsel, I determined that hourly rates of $250 for partner time and $75 for paralegal time to be the appropriate rates to be applied in similar litigation. See Taylor v. Delta-Sonic Car Wash Systems, Inc., No. 14-cv-6698, 2017 WL 436045 (W.D.N.Y. Jan. 31, 2017). While both Mullin and Cordello have experience in FLSA cases, neither has spent decades practicing law. Mullin was admitted to practice law in 2008 and Cordello in 2003. An hourly rate of $250 for legal services and $75 for paralegal time strikes this Court as both fair and reasonable given their years in practice and the hourly rate employed by comparable attorneys here in the Western District.

21. Applying these rates yields a total presumptively reasonable fee of $110,902.50 for attorney time and $1,194 for paralegal time. The resulting total fee is $112,096.50.

22. The lodestar multiplier is calculated dividing the award by the product of the attorneys' presumptively reasonable hours and a presumptively reasonable hourly rate. Here, that formula yields a lodestar multiplier of 2.84.

23. When the lodestar multiplier cross-check is performed, I conclude that the $318,000 fee award fits within the range of multipliers accepted by courts in this district. See In re Eastman

Kodak ERISA Litig., 213 F. Supp. 3d 503, 509 (W.D.N.Y. 2016) (Larimer, J.) (approving lodestar multiplier of 3.25 non-FSLA class action); Acevedo v. Workfit Medical LLC, 187 F. Supp. 3d 370 (W.D.N.Y. 2016) (Wolford, J.) (in FSLA class action, endorsing lodestar multiplier of 1.3); Davis v. J.P. Morgan Chase & Co., 827 F. Supp. 2d 172, 185 (W.D.N.Y. Oct. 11, 2011) (Larimer, J.) (lodestar multiplier of 5.3 in FSLA class action); Odom v. Hazen Transport, Inc., 275 F.R.D. 400, 413 (W.D.N.Y. 2011) (Payson, J.) (lodestar multiplier of 1.04 in FSLA class action).

24. Therefore, the Court hereby grants the Second Attorneys' Fees Motion (Docket # 59) and, under the unique and specific facts presented here, awards fees in the amount of $318,000, or 2.84 times the presumptively reasonable award.

25. Class Counsel are also awarded reimbursement of litigation costs and disbursements in the amount of $2,227.04. In making this award, the Court is relying on the truth and accuracy of the representations made in paragraph 47 of Mullin's August 2, 2017 Declaration (Docket # 59-2).

26. Counsel for plaintiffs seek court approval for payment of "service payments" of $10,000 to named plaintiff Adam Cunningham and $7,500 each to named plaintiffs Alex Chefalo and Remo Paglia. Counsel also requests payments of $500 each to Brian Beyer, Antonio Caso, Joshua Kaplan, Erin Manning, Patrick Rich and Heather Valder, each of whom supplied declarations in support of plaintiffs' class

certification motions.    Granting service payments or incentive
awards to class representatives is within the discretion of the
Court.

> In calculating incentive fees, courts consider: the
> existence of special circumstances including the
> personal risk (if any) incurred by the plaintiff
> applicant in becoming and continuing as a litigant, the
> time and effort expended by that plaintiff in assisting
> in the prosecution of the litigation or in bringing to
> bear added value (e.g., factual expertise), any other
> burdens sustained by that plaintiff in lending himself
> or herself to the prosecution of the claim, and of
> course, the ultimate recovery.

Frank v. Eastman Kodak Co., 228 F.R.D. 174, 187 (W.D.N.Y. 2005)

(quoting Roberts v. Texaco, Inc., 979 F. Supp. 185, 200 (S.D.N.Y.

1997)).

27.   "Courts have reduced, rejected or questioned incentive
awards where named plaintiffs 'did not perform any extraordinary
services to the class.' " In re Western Union Money Transfer
Litig., No. CV-01-0335, 2004 WL 3709932, at *16 (E.D.N.Y. Oct. 19,
2004) (quoting Weseley v. Spear, Leeds & Kellogg, 711 F. Supp.
713, 720-21 (E.D.N.Y. 1989)); see Altnor v. Preferred Freezer
Services, Inc., 197 F. Supp. 3d 457, 771 (E.D. Pa. 2016) ("A
rubber-stamped approval by the Court of an unjustified incentive
award is fodder for abuse.").

28.   In support of their applications, each of the Named
Plaintiffs submitted an affidavit.   Plaintiffs assert that they
(1) provided extensive information on the conditions and policies

at numerous pizza locations and company-wide policies; (2) helped locate potential class members; (3) encouraged potential class members to join; (4) conferred with plaintiffs' counsel; (5) provided declarations in support of conditional certification motion and (6) communicated with individual class members throughout the litigation. See Mem. in Support of Motion for Final Order (Docket # 46-1), at 24; see also Named Pl. Decls. at Docket ## 46-3, 46-4, 46-5.   In addition, Cunningham states that he was responsible for initially seeking representation and could have potentially received a larger recovery by pursuing his claim alone. See Docket # 46-3.   Accordingly, the Court grants counsel's request for service awards as they pertain to Cunningham, Chefalo and Paglia.

29.   Plaintiffs also request service payments of $500 for the class members Brian Beyer, Antonio Caso, Joshua Kaplan, Erin Manning, Patrick Rich and Heather Valder, each of whom allegedly supplied declarations in support of plaintiff's class certification motion.   See Decl. of Robert Mullin (Docket # 46-2), at ¶ 39.   The service awards for these individuals have been supported by a recent filing by plaintiffs' counsel. See Decl. of Robert Mullin (Docket # 60).   Based on the detail provided in that Declaration and accompanying attachments, I find the $500 service award for these six individuals to be justified and reasonable.

30. The Court will also grant the parties' request to allow $49,000 for the fees and expenses of the settlement administrator. See Decl. of Derek Smith (Docket # 58-3), at ¶ 14. This request is reasonable in light of the proposed class size of approximately 8,500 people, and the costs and expenses associated with mailing notices to all of those people (sometimes multiple times), providing telephone support, processing, and administering the notices, and distributing the awards and tax documentation to the claimants. See Acevedo, 187 F. Supp. 3d at 386 (approving settlement administrator fees of $27,500 for a class of 900 people).

31. Accordingly, plaintiffs' first motion for settlement final approval (Docket # 46) and first motion for attorney fees (Docket # 47) are **denied as moot**. Plaintiffs' second motion for settlement final approval (Docket # 58) is **granted**. Plaintiffs' second motion for attorney fees (Docket # 59) is **granted** to the extent it awards plaintiffs' counsel $318,000 in attorney fees and $2,227.04 in costs.

32. Upon the Effective Date of the Settlement Agreement, this action shall be deemed dismissed with prejudice in its entirety. The parties are to bear their own costs, except as otherwise provided in the Settlement Agreement and this Order. The Court shall retain jurisdiction over the above-captioned actions for the purpose of resolving any issues relating to the

39

administration, implementation, or enforcement of the Settlement
Agreement and this Order. The parties are to inform the Court
immediately upon the occurrence, of the Effective Date of the
Settlement Agreement.

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:    December 1, 2017
          Rochester, New York

40